**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**EVANSVILLE DIVISION**

| | | |
|---|---|---|
| **MARC SCHIELE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 3:24-cv-30-MPB-CSW** |
| | ) | |
| **CITY OF EVANSVILLE,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT CITY OF EVANSVILLE'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

The Defendant, City of Evansville ("City"), by counsel, hereby submits its Memorandum

of Law in Support of its Motion for Summary Judgment.

**I.    INTRODUCTION**

This case is an example of no-good deed goes unpunished. Plaintiff ("Schiele") first

became employed by the Evansville Fire Department ("EFD") in 2011. Beginning in late 2021,

Schiele began having significant mental health issues. These issues increasingly limited Schiele's

ability to work as a firefighter. Schiele found it necessary to request and receive numerous

Family and Medical Leave Act of 1993 ("FMLA") leaves due to the increasing severity of his

mental health issues. All of which were granted by the City.

From the beginning of Schiele's mental health issues, the City has sought to support him,

approving leave requests and reasonably accommodating his needs. However, Schiele's health

issues, including anxiety, depression, and post-traumatic stress disorder, eventually became

incompatible with the essential functions of the position he maintained with the EFD. As a result

of his health issues, Schiele's own treating psychiatrist requested that Schiele have (a) a private

workspace with the ability to control or dim lighting and have as much natural light as possible; (b) an actual walled office with doors as opposed to dividers or cubicles; (c) a space with reduced noise and away from the sounds of the dispatch radio; (d) the option to work from home; and (e) possible adequate notice of tasks, for example of notifying him a day ahead rather than the day something is needed. As these requests are wholly inconsistent with the essential functions and duties of a firefighter, it became obvious to the City that Schiele could no longer serve in his position due to his disability. Due to the question of Schiele's ability to continue in his position, the EFD Pension Board met and decided that Schiele had a Class 3 impairment and recommended he be issued a disability pension. Critically, Schiele stipulated during the EFD Pension Board meeting that he had a disability.

Throughout this process with Schiele, the City's goal was to protect and ensure the safety of its firefighters, Schiele, and the citizens of Evansville. Nevertheless, the City's efforts were rewarded with the filing of a lawsuit alleging that the City disclosed Schiele's confidential medical information, interfered with his FMLA, and improperly retaliated against him in violation of the FMLA and the Americans with Disabilities Act ("ADA"). However, the undisputed facts show that there is no legal basis for these claims and that the real reason for the filing of this lawsuit was to gain closure, as evident by Schiele's stated goal of filing the lawsuit:

> "So I guess my goal is to understand why I was let go from the fire department, and then also so that I can understand the process of them letting me go, along with getting answers regarding, I guess, the things that occurred throughout the process."

[Dkt 32-3 at 5 (Schiele Dep. 7:15-19).]

## II.    STATEMENT OF MATERIAL FACTS NOT IN DISPUTE[1]

---

[1] The City accepts the following facts as true only for purposes of summary judgment. The City reserves the right to contest any facts at trial.

2

A.      **Background.**

1.      On or about July 25, 2011, Schiele was hired by the City as a firefighter with the EFD. [Dkt No. 1 at 2, ¶ 11).]

2.      On or about 2016, Schiele was diagnosed with anxiety, depression, and post-traumatic stress disorder. [Dkt No. 32-3 at 23 (Schiele Dep. 29:3-8).]

3.      At all times relevant to the allegations in his Complaint, Schiele held the rank of Lieutenant with the EFD. [Dkt No. 1 at 2, ¶ 12; Dkt 33-1 at 5 (Schiele Dep. 14:15-19).]

4.      At all times relevant to the allegations in the Complaint, Charles "Mike" Connelly "Chief Connelly" was the Chief of the EFD. [Dkt No. 32-5 at 5 (Connelly Dep. 11:16-20).]

5.      At all times relevant to the allegations in the Complaint, Paul Anslinger "Anslinger" was the Assistant Chief of the EFD. [Dkt No. 32-6 at 5-6 (Anslinger Dep. 9:24-25, 10:1-15).]

6.      At all times relevant to the allegations in the Complaint, Anthony "Tony" Knight was EFD's Chief of Health and Safety. [Dkt No. 32-1 at 1, ¶ 3].

7.      The essential job tasks of a firefighter include:

   a.  Operating fire apparatus or other vehicles in an emergency mode with emergency lights and sirens;

   b.  Critical, time-sensitive complex problem solving during physical exertion in stressful hazardous environments, including hot, dark, tightly enclosed spaces, that is further aggravated by fatigue, flashing lights, sirens, and other distractions;

   c.  Ability to communicate (i.e. give and comprehend verbal orders) while wearing PPE and SCBA under conditions of high background noise, poor visibility, and drenching from hose lines or fixed protection systems (e.g. sprinklers);

   d.  Functioning as an integral component of a team, where sudden incapacitation of a member can result in mission failure or in risk of injury or death to members of the public or other team members.

[Dkt No. 32-7 at 2.]

3

8.     From December 13-20, 2021, Schiele was granted FMLA leave due to his anxiety, depression, and post-traumatic stress disorder. [Dkt No. 1 at 3, ¶ 14; Dkt No. 32-3 at 24 (Schiele Dep. 30:5-10).]

9.     On or about December 20, 2021, Schiele was granted intermittent FMLA leave, allowing him leave one (1) to two (2) times per month for one (1) to three (3) days per time. [Dkt No. 1 at 3, ¶ 14.]

10.     On or about February 14, 2022, Schiele was placed on administrative, or light duty ("light duty"), by the City while he had an Adult Psychological Examination with Carolyn Hines, PhD ("Dr. Hines"), who conducts the City's Fitness for Duty ("FFD") Evaluations. [Dkt No. 1 at 3, ¶ 15.]

11.     All light duty assignments take place in the EFD administration building, rather than a station house with a crew that responds to dispatched emergency runs. [Dkt No. 32-4 at 5 (Knight Dep. 44:20-24).]

12.     On or about February 18, 2022, Schiele met with Dr. Hines for his Adult Psychological Examination. [Dkt No. 32-2 at 1; Dkt No. 32-5 at 52-67.]

13.     The primary purpose of the February 18, 2022 Adult Psychological Examination was to determine if Schiele retained the ability to work in situations requiring him to be physically and mentally able to work without presenting a danger to himself or others. [Dkt No. 32-2 at 4.]

14.     After the February 18, 2022 Adult Psychological Examination, Dr. Hines prepared a report summarizing the examination "2/18/22 Examination Report." [Dkt No. 32-2 at 1, ¶ 4.]

15.     The 2/18/22 Examination Report states that Schiele described having flashbacks and biweekly nightmares which caused him to be scared or sad upon wakening. [Dkt No. 32-2 at 4.]

16.     The 2/18/22 Examination Report states that Schiele rated his usual daily depression level at 2-3/10 and his anxiety as 4-5/10. However, he described that in social settings his anxiety could rise to an 8-9/10. [Dkt No. 32-2 at 4.]

17.     At the conclusion of the 2/18/22 Examination Report, it states that Schiele promised to see his personal therapist more often, take his prescribed medication per his doctor's orders, and communicate via text with Dr. Hines over the following weeks so that she could continue to evaluate his progress. [Dkt No. 32-2 at 5.]

18.     After the February 18, 2022 Adult Psychological Examination, Dr. Hines forwarded the 2/18/22 Examination Report to Knight. [Dkt No. 32-2 at 1, ¶ 5.]

19.     Following the February 18, 2022 Adult Psychological Examination, Schiele returned to full duty and continued utilizing his FMLA leave. [Dkt No. 1 at 3, ¶ 15.]

20.     On July 11, 2022, Dr. Hines told Knight that Schiele was not checking in with her as he had agreed to do in his February 18, 2022, FFD Evaluation. [Dkt No. 32-4 at 39.]

21.     On or about July 18, 2022, Schiele was placed on light duty so that the City could maintain adequate scheduling and staffing within the department. [Dkt No. 1 at 3, ¶ 16; Dkt No. 32-4 at 39; Dkt No. 32-5 at 19 (Connelly Dep. 33:11-18).]

22.     While on light duty, Schiele's responsibilities included covering the front desk, doing administrative-type work, paper filing, helping the training division with classes, and continuing with his EMS training. [Dkt No. 32-4 at 17-8 (Knight Dep. 61:1-14; 62:3-11).]

23.    On or about July 22, 2022, Schiele met with Dr. Hines for an Adult Psychological Examination and 6-Month Follow-Up to assess his progress, as Dr. Hines believed Schiele's issues should have been resolved. [Dkt No. 1 at 3, ¶ 16; Dkt No. 32-4 at 39.]

24.    After the July 22, 2022 Adult Psychological Examination, Dr. Hines prepared a report summarizing the examination "7/22/22 Examination Report." [Dkt No. 32-2 at 1, ¶ 4.]

25.    The 7/22/22 Examination Report stated that Schiele expressed that he was exhausted all the time, had an average depression level of 7-8/10, and had an average anxiety level of 9/10. [Dkt No. 32-2 at 7.]

26.    The 7/22/22 Examination Report stated Schiele described having occasional work-related flashbacks and initial and middle insomnia. [Dkt No. 32-2 at 7-8.]

27.    As a result of the meeting July 22, 2022 Adult Psychological Examination and 6-Month Follow-Up, Dr. Hines stated that she was of the opinion that Schiele may not be able to perform the quick judgment and decision-making aspects of the job of firefighter and thus may be a danger to himself or others on the job. [Dkt No. 32-2 at 9.]

28.    After the July 22, 2022 Adult Psychological Examination and 6-Month Follow-Up, Dr. Hines forwarded the 7/22/22 Examination Report to Knight. [Dkt No. 32-2 at 1, ¶ 5.]

**B.    Schiele's Assignment to Light Duty and Transfer to Station 2.**

29.    On or about August 26, 2022, while still on light duty, Schiele was transferred from EFD Station 16 to EFD Station 2. [Dkt No. 1 at 4, ¶ 18; Dkt No. 32-6 at 13 (Anslinger Dep. 29:7-18); Dkt No. 32-4 at 6 (Knight Dep. 45:16-24).]

30.    Station 16 required a Lieutenant to be physically present and on duty as much as possible, because it was one of EFD's busier stations. [Dkt No. 32-5 at 19 (Connelly Dep. 33:21); Dkt No. 32-4 at 7 (Knight Dep. 46:17-19).]

31.    Station 2 was one of EFD's slower stations in terms of the number of runs it responded to. [Dkt No. 32-4 at 8 (Knight Dep. 47:12-14); Dkt No. 32-5 at 19 (Connelly Dep. 33:21-22).]

32.    Since Station 2 was one of EFD's slower stations, the ability to operate functionally as a station was less reliant on the regular presence of a Lieutenant. [Dkt No. 32-4 at 8 (Knight Dep. 47:12-18).]

33.    Schiele never worked at Station 2, because he was on light duty, and therefore working from the EFD Administration Building. [Dkt No. 32-3 at 32 (Schiele Dep. 54:10-14); Dkt No. 32-4 at 7-8 (Knight Dep. 46:22-24, 47:3-5).]

34.    Schiele's transfer to Station 2 allowed EFD to staff Station 16 with a new Lieutenant that would physically work out of the stationhouse. [Dkt No. 32-5 at 21 (Connelly Dep. 35:8-13).]

35.    Schiele's transfer to Station 2 also allowed the City to better accommodate Schiele's intermittent FMLA leave. [Dkt No. 32-4 at 7 (Knight Dep. 46:17-21); Dkt No. 32-5 at 19 (Connelly Dep. 33:14-22).]

36.    When Schiele was assigned to light duty, and when he was transferred to Station 2, he retained the same rank, seniority, and pay as when he was on active duty at Station 16. [Dkt No. 32-4 at 22 (Knight Dep. 66:8-14).]

37.    As Knight testified in his deposition:

    8   Q  And whenever the firefighter is on light duty, do
    9      they maintain their seniority?
    10  A  Yes.
    11  Q  Okay.
    12  A  Yes. Everything stays the same. The pay stays the
    13     same. The rank stays the same. The seniority
    14     continues to grow. Nothing changes. [Dkt No. 32-4 at 22 (Knight 66:8-14).]

38.    No employees were sent to Station 2 as punishment. In fact, heavily decorated firefighters work and have worked at Station 2. [Dkt No. 32-4 at 9-10 (Knight Dep. 48:17-25, 49:1-15); Dkt No. 32-5 at 22 (Connelly Dep. 36:13-21); Dkt No. 32-6 at 15-6 (Anslinger Dep. 31:12-25, 32:1-16).]

39.    Transfers to Station 2 were solely for the purpose of meeting staffing needs. [Dkt No. 32-5 at 48 (Connelly Dep. 64:16-20).]

40.    On or about August 26, 2022, Schiele met with Dr. Hines for another Adult Psychological Examination. [Dkt No. 32-2 at 1, ¶ 3.]

41.    After the August 26, 2022 Adult Psychological Examination, Dr. Hines prepared a report summarizing the examination "8/26/22 Examination Report." [Dkt No. 32-2 at 1, ¶ 4.]

42.    The 8/26/22 Examination Report stated that Schiele expressed that he feels exhausted all the time. [Dkt No. 32-2 at 10.]

43.    After the August 26, 2022 Adult Psychological Examination, Dr. Hines forwarded the report to Knight. [Dkt No. 32-2 at 1, ¶ 5.]

44.    On or about October 21, 2022, Schiele met with Dr. Hines for another Adult Psychological Examination and Follow-Up. [Dkt No. 32-2 at 1, ¶ 3.]

45.    After the October 21, 2022 Adult Psychological Examination and Follow-Up, Dr. Hines prepared a report summarizing the examination "10/21/22 Examination Report." [Dkt No. 32-2 at 1, ¶ 4.]

46.    The 10/21/22 Examination Report stated that Schiele expressed that his anxiety level was very high and rated it as 11 out of 10 and unreal. It further stated that Schiele declined to rate his level of depression. [Dkt No. 32-2 at 13.]

47.     Dr. Hines, after meeting with Schiele for the Adult Psychological Examination and Follow-Up, stated in the 10/21/22 Examination Report that she did not feel comfortable clearing Schiele to return to the fire station because his medications, along with his depression and anxiety, typically cause slowness of thought which affects decision-making, especially in situations requiring split-second decisions such as firefighters face. [Dkt No. 32-2 at 13-14.]

48.     Dr. Hines stated in the 10/21/22 Examination Report that Schiele was not a person capable of caring for himself and others during critical situations. [Dkt No. 32-2 at 13.]

49.     Dr. Hines further stated in the 10/21/22 Examination Report that she found it disturbing that Schiele stated his stress was so severe that he was unable to complete his light duty tasks on the day of their meeting and must instead take leave. [Dkt No. 32-2 at 14.]

50.     After the October 21, 2022 Adult Psychological Examination and Follow-Up, Dr. Hines forwarded the 10/21/22 Examination Report to Knight. [Dkt No. 32-2 at 1, ¶ 5.]

51.     At all times relevant to the allegations in Schiele's Complaint, Dr. Ashraf Ahmed ("Dr. Ahmed") was Schiele's personal psychiatrist. [Dkt No. 32-3 at 62; Dkt No. 32-8 at 1.]

52.     While on light duty, Schiele sought an accommodations list from Dr. Ahmed. [Dkt No. 32-3 at 32-3 (Schiele Dep. 54:24-25, 55:1-4); Dkt No. 32-3 at 62; Dkt No. 32-4 at 26-7 (Knight Dep. 70:25, 71:1-7).]

53.     Dr. Ahmed prepared a letter on Schiele's behalf which included a list of requested accommodations. [Dkt No. 32-3 at 62.]

54.     Schiele forwarded this accommodations letter to Knight in November 2022. [Dkt No. 32-4 at 27 (Knight Dep. 71:1-7).]

55.     The accommodations letter requested that Schiele have (a) a private workspace with the ability to control or dim lighting and have as much natural light as possible; (b) an

9

actual walled office with doors as opposed to dividers or cubicles; (c) a space with reduced noise and away from the sounds of the dispatch radio; (d) the option to work from home; and (e) possible adequate notice of tasks, for example of notifying him a day ahead rather than the day something is needed. [Dkt No. 32-3 at 62; Dkt No. 32-4 at 27 (Knight Dep. 71:10-13); Dkt No. 32-5 at 32, 34 (Connelly Dep. 47:5-6, 10-13, 49:13-14).]

56.    The City granted all of Schiele's accommodation requests other than the request to work from home. [Dkt No. 32-3 at 36-8 (Schiele Dep. 58:20-25, 59:1-3, 25, 60:1-2); Dkt No. 1 at 4-5, ¶ 20; Dkt No. 32-4 at 28 (Knight 72:1-2); Dkt No. 32-3 at 61.]

57.    The request to work from home was not granted, because it is difficult for those on light duty to do the work from home, and the City had no EFD officers who worked from home. [Dkt No. 32-4 at 28 (Knight 72:1-4); Dkt No. 32-3 at 61.]

**C. Schiele's alleged "confidential medical information."**

58.    When asked which information was improperly disclosed Schiele stated:

```
21    Q    Again, I just want to be clear because we kind of
22          went back and forth on it. The information at
23          issue is the accommodations letter -- well, you
24          said conclusions that people may draw from the
25          letter. Is there anything else?
1     A     Conclusions that people did draw from the letter.
2           And then I can't think of anything else now, no.
```

[Dkt No. 32-3 at 47-8 (Schiele Dep. 69:21-25, 70:1-2).]

59.    The executive staff for EFD in 2022 was Anslinger, Ron Campbell ("Campbell"), and Mike Larson ("Larson"). [Dkt No. 32-5 at 29 (Connelly Dep. 44:14-16).]

60.    The executive staff met with Chief Connelly every Monday, and at some of these meetings discussed Schiele for purposes of staffing and accommodation reasons. [Dkt No. 32-5 at 29, 31 (Connelly Dep. 44:17-18, 46:11-13).]

61.    The accommodation request was told to Anslinger as he was the assistant chief. As the second in command of EFD, he needed to know what was going on within EFD. [Dkt No. 32-5 at 12-3, 17 (Connelly Dep. 31:10-17, 26:23-25, 27:1).]

62.    Campbell was informed because he was involved in operations and staffing of EFD. [Dkt No. 32-5 at 18 (Connelly Dep. 32:7-12).]

63.    Larson was informed because he was involved with staffing and scheduling of personnel, as well as Schiele's day-to-day supervisor. [Dkt No. 32-5 at 17, 35 (Connelly Dep. 31:20-23, 50:8-9).]

64.    James Cohen ("Cohen") was informed because he was the captain in charge of Schiele. [Dkt No. 32-5 at 35 (Connelly Dep. 50:12-18).]

65.    Mike Kane ("Kane"), if he was informed, was done so because he was Schiele's superior officer as the district chief. [Dkt No. 32-5 at 33-4 (Connelly 48:23-25, 49:1-6).]

66.    Larry Zuber ("Zuber") was informed that the City was going "to accommodate one of his firefighters and that we're (the City) trying to get him the help that he needs to become whole," because he was the elected officer of the firefighters as the president of the firefighter's union. [Dkt No. 32-5 at 33 (Connelly Dep. 48:12-22).]

67.    Schiele has not seen any document of his medical information being sent to somewhere he doesn't believe it belongs. [Dkt No. 32-3 at 48 (Schiele Dep. 70:15-18).]

**D.    Schiele is Brought Before the EFD Pension Board.**

68.    On or about December 8, 2022, Schiele received a letter from Knight informing Schiele that his disability hearing would be held February 8, 2023. [Dkt No. 1 at 5-6, ¶ 23.]

69.     The disability hearing was held as there was concern about Schiele's fitness based on Dr. Hine's evaluations and the reasons behind Schiele's disability. [Dkt No. 33-2 at 5 (Knight Dep. 90:15-23).]

70.     On or about February 8, 2023, the EFD Pension Board decided that Schiele had an impairment covered by the 1977 Firefighter Pension Fund and recommended that Schiele's impairment was a Class III impairment. (Dkt No. 1 at 5-6, ¶ 23; Connelly Dep. 58:5-7; Dkt No. 32-4 at 35 (Knight Dep. 85:2-9).]

71.     In preparation for the disability hearing, Dr. Ahmed reported to the Pension Board that "he supported the disability claim" and he "feels [Marc] is unable to work in the capacity in the fire department." [Dkt No. 32-8 at 1.]

72.     Schiele testified at the hearing and stipulated that he had a covered impairment. [Dkt No. 32-1 at 4.]

73.     Schiele is appealing his disability determination and is seeking a higher class of impairment. [Dkt No. 32-3 at 20 (Schiele Dep. 26:5-10).]

74.     Schiele is not appealing the fact he was determined to have a disability. [Dkt No. 32-3 at 20 (Schiele Dep. 26:17-21).]

75.     During Schiele's use of FMLA he was never denied FMLA leave when requested. [Dkt No. 32-3 at 31 (Schiele Dep. 53:23-25).]

76.     On or about February 28, 2023, Schiele filed a Charge of Discrimination alleging violations of the ADA. [Dkt No. 1 at 6, ¶ 24.]

77.     Schiele has not amended his Charge of Discrimination or filed a new Charge of Discrimination. [Dkt No. 32-9 at 2.]

78.     EFD Policy 100.007 states that firefighters who have resigned or retired shall have an exit interview. [Dkt No. 32-1 at 7; Dkt No. 32-3 at 56 (Schiele 84:15-16).]

79.     EFD Policy 100.007 does not apply to those firefighters who were fired or determined to have a disability by the EFD Pension Board. [Dkt No. 32-1 at 2, ¶ 11.]

80.     Schiele did not return his department issued clothing and gear ("PPE") after several requests from the EFD. [Dkt No. 32-3 at 55 (Schiele Dep. 83:12-17).]

81.     The City deducted $1,467 from Schiele's paycheck on July 7, 2023. [Dkt No. 1 at 6, ¶ 26; Dkt No. 32-3 at 55 (Schiele Dep. 83:12-17).]

82.     Schiele stated that he was refusing to return the PPE because he wanted to "ensure that the process was being followed by the EFD," and he wanted his exit interview. [Dkt No. 32-3 at 55 (Schiele Dep. 83:12-17).]

83.     Once Schiele returned his PPE, the City refunded the $1,467 to him, which he received within a couple weeks of returning the PPE. [Dkt No. 32-3 at 57 (Schiele Dep. 85:2-10).]

84.     Schiele testified when asked the reason for the lawsuit: "So I guess my goal is to understand why I was let go from the fire department, and then also so that I can understand the process of them letting me go, along with getting answers regarding, I guess, the things that occurred throughout the process." [Dkt No. 32-3 at 7 (Schiele Dep. 7:15-19).]

### III.    STANDARD OF REVIEW

"Summary judgment is the 'put up or shut up' moment in a lawsuit." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). As explained by this Court:

Federal Rules of Civil Procedure 56 provides that summary judgment should be granted when the evidence establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 . . . . The purpose of

summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 587 . . . . Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.* at 255 . . . . However, neither the "mere existence of some alleged factual dispute between the parties," *id.* at 247 [], nor the existence of "some metaphysical doubt as to the material facts, *id.* at 586 [], will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). The nonmovant may not simply rest on the pleadings but must affirmatively demonstrate by specific factual allegations that a genuine issue of material fact exists for trial. *Payne v. Pauley*, 337 F.3d 767, 777 (7th Cir. 2003).

*Darnell v. Wal-Mart Stores, Inc.*, Cause No. 1:16-cv-02754-MPB-JMS, 2018 WL 573094 at *1 (S.D. Ind. 2018).

## IV.    ARGUMENT

Marc Schiele is no longer a firefighter with the EFD, because he could no longer perform the essential functions of the job. This is not in dispute given the nature of the accommodations he sought, as well as his own admission at the EFD Pension Board disability hearing that he had a covered impairment. Accordingly, Schiele has no damages for no longer being a firefighter, because it has been established that he is no longer capable of being a firefighter.

Schiele filed this lawsuit as a search for answers and to "understand the process." In doing so, he tries to distract from the truth that he was rightfully brought before the EFD Pension Board by raising perceived issues with the events that led to that decision. Specifically, Schiele believes that the City wronged him by: 1) disclosing confidential medical information; 2) requiring him to appear before the EFD Pension Board; 3) refusing him an exit interview; 4) improperly withholding wages; 5) assigning him to light duty; and 6) transferring him to Station 2. Unfortunately for Schiele, his beliefs do not override the undisputed material facts and the well-established law of this Circuit. Schiele's search for answers leads to but one conclusion, he has suffered no injury on account of the City, and all actions taken by the City were for

14

legitimate, non-retaliatory reasons, so that it could best provide emergency services to the citizens of Evansville.

> **A.      Summary Judgment is Proper on Schiele's FMLA Interference Claim as Schiele Has Failed to Establish the Necessary Elements.**

The FMLA establishes two types of legal claims for protection of FMLA rights. *Snelling v. Clarian Health Partners, Inc.*, 184 F.Supp.2d838, 845 (S.D. Ind. 2002). Under the first, employers are prohibited from interfering with, restraining, or denying the exercise of or the attempt to exercise any FMLA rights. *Goelzer v. Sheboygan County, Wis.*, 604 F.3d 987, 992 (7th Cir. 2010) (citing 29 U.S.C. § 2612(a)(1)). Schiele has sought to establish that the City has interfered with his usage of FMLA. However, he cannot establish an essential element of his claim, and the City is entitled to summary judgment in its favor.

To establish an FMLA interference claim, an employee must show that the employer deprived them of an FMLA entitlement. *Taylor-Novotny v. Health Alliance Medical Plans, Inc.*, 772 F.3d 478, 498 (7th Cir. 2014). More specifically, the employee must establish that (1) they were eligible for the FMLA's protections; (2) their employer was covered by the FMLA; (3) they were entitled to take leave under the FMLA; (4) they provided sufficient notice of their intent to take leave; and (5) their employer denied their FMLA benefits to which they were entitled. *Pagel v. TIN Inc.*, 695 F.3d 622, 627 (7th Cir. 2012) (quoting *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 825 (7th Cir. 2011)). Analysis of the first 4 elements is unnecessary, because Schiele cannot establish that the City interfered with his FMLA rights by denying him FMLA benefits. Accordingly, his claim fails.

Starting in December of 2021, Schiele began taking FMLA leave for his covered impairment. Schiele continuously took intermittent FMLA leave until his mental health condition rendered him eligible for disability benefits available to firefighters. At no point from December

of 2021 till he was placed on disability was Schiele ever denied FMLA when he requested to use it. [Facts, ¶ 75.] As Schiele was never denied the ability to use FMLA leave, Schiele cannot establish that the City interfered with his use of FMLA as the denial of FMLA benefits is a requirement for establishing interference.

### 1. Schiele's Specific Interference Claim also Fails, Because Employers Have Flexibility in Staffing and Operations.

Employers have flexibility in working with employees when it is established that the employee has serious health conditions, including placing employees on involuntary leave if it determines the employees' condition prohibits them from doing the essential functions of their job. *Cozad v. Illinois Dept. of Corrections*, 2018 WL 2758261, No. 4:16–cv–4131–SLD–JEH, *6 (C.D. Ill. 2018) (collecting numerous cases). Courts have held that if an employee is unable to perform the essential functions of their jobs, the employer is not obligated to restore the employee to their position. *McManus v. Saint Mary's College*, 611 F.Supp.3d 586, 595 (N.D. Ind. 2020) (citing *James v. Hyatt Regency Chicago*, 707 F.3d 775, 781 (7th Cir. 2013); *Hendricks v. Compass Grp., USA, Inc.*, 496 F.3d 803, 806 (7th Cir. 2007)). Further, Courts have held that employers are allowed to transfer employees taking intermittent FMLA leave to another position temporarily if they are unable to fulfill the essential functions of their job while taking the leave. *Lewis v. School Dist. #70*, 523 F.3d 730, 743 (7th Cir. 2008) (Finding that the employer "could have transferred Ms. Lewis to another position (such as a teacher's assistant position) temporarily if she was unable to fulfill the essential functions of her job while taking intermittent FMLA leave.").

In this case, Schiele argues that subjecting him to light duty assignment while taking his intermittent FMLA leave was an interference with his benefits. Schiele began to take FMLA leave due to his disability, including anxiety, depression, and post-traumatic stress disorder.

16

[Facts, ¶ 8.] The City determined that Schiele and the City would be best served if Schiele was placed on light duty assignment after considering: (1) Schiele's disability; (2) the essential functions and requirements of a firefighter; (3) Dr. Hines' reports; (4) and the fact that Station 16, a busy station, was without a necessary member of the unit. [Facts, ¶¶ 7, 12-17, 21.] Assigning Schiele to light duty was not required. Instead, the City could have sought to place him on continuous leave. Rather, the City, like St. Mary's College, reasonably accommodated Schiele's disability and the situation they were presented with. Like the court's holding in *Saint Mary's College*, the Court should find that this action was not an interference with Schiele's FMLA rights. *See Saint Mary's College*, 611 F.Supp.3d at 598.

### B.     FMLA and ADA Retaliation

Schiele alleges that the City retaliated against him in violation of FMLA and ADA by: (1) moving him to light duty; (2) reassigning him to Station 2; (3) requiring his appearance in front of EFD's Pension Board; (4) refusing him an exit interview; and (5) withholding wages.

"The FMLA and ADA 'are legally distinct, but in cases claiming unlawful retaliation, the analyses ... overlap;" as such, courts often analyze both together. *Trahanas*, 64 F.4th 842, 856 (7th Cir. 2023) (quoting *Freelain v. Village of Oak Park*, 888 F.3d 895, 900 (7th Cir. 2018)). To prove retaliation, the employee must show that "(1) the employee engaged in statutorily protected activity; (2) the employer subjected [plaintiff] to an adverse action; and (3) the protected activity caused the adverse action." *Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018); *King v. Ford Motor Co.*, 872 F.3d 833, 841 (7th Cir. 2017).

If the employee meets his burden on each element, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is

pretextual." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019)

(quoting *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 719 (7th Cir. 2018). A pretextual reason is

one that is dishonest, or a lie. *Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 413 (7th

Cir. 2018). Absent evidence demonstrating that an employer did not honestly believe the reasons

it gave in support of its decision, a court will not second guess its decision, weigh the prudence

of its decision, or correct even an unwise or unfair decision; rather, our courts routinely observe

they are authorized to correct only *unlawful* decisions. *Mitchell v. Muncie Cmty. Sch.*, 2017 U.S.

Dist. LEXIS 108289, *52-53 (S.D. Ind. July 13, 2017) (accumulating cases on the issue of

pretext). Schiele's claims fail because he cannot meet his burden on every element and even if he

could, he cannot show that the City's reasoning was pretextual.

### 1. Light Duty, Reassignment, and Refusing an Exit Interview Are Not Adverse Actions.

Schiele begins by asserting that the City's act of moving him to light duty, reassigning

him to Station 2, and refusing him an exit interview are adverse actions. Courts have held that

"conduct is "'materially adverse' if it would have 'dissuaded a reasonable worker from making

or supporting a charge of discrimination" or from "engaging in the protected activity." *Stephens

v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) (quoting *Burlington N. & Santa Fe Ry. Co. v.

White*, 548 U.S. 53, 68 (2006)); *Summerland v. Exelon Generation Co.*, 455 F.Supp.3d 646, 659

(N.D. Ill. 2020) (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 740 (7th Cir. 2011)). However,

none of these actions constitute an adverse employment action as they would not have dissuaded

a reasonable worker from acting within their rights of either the ADA or the FMLA.

### a. Transferring, Reassigning, or Adjusting Job Responsibilities Are Within the Rights of an Employer.

"Our decisions involving a transfer or reassignment of job responsibilities indicate that

such an action is not materially adverse unless it represents a significant alteration to the

employee's duties, which is often reflected by a corresponding change in work hours, compensation, or career prospects." *Stephens*, 569 F.3d at 791. The acts of moving Schiele to light duty and reassigning him to Station 2 were not materially adverse. Rather, like the Department in *Koty*, the actions were within the right of the City to ensure its staffing and operations needs were met, as well as to ensure Schiele was accommodated.

In *Koty v. DuPage County, Illinois*, the plaintiff was transferred from law enforcement to courthouse duty which the plaintiff viewed as materially adverse. 900 F.3d 515, 520 (7th Cir. 2018). The plaintiff believed that the move was in retaliation for his filing of an EEOC charge. However, the Court held that the action was not materially adverse because the transfer did not result in a pay decrease and was not particularly harmful, even though it diminished the opportunity for overtime pay, changed his shift time, and was slightly less prestigious, because it was the Department's attempt to accommodate the plaintiff's hip pain. *Id.* ("'It is the employer's prerogative to choose a reasonable accommodation,' *Jay v. Intermet Wagner, Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000), and the Department's decision to accommodate Koty's request in a way other than what he requested was not an adverse employment action. *See Hancock v. Potter*, 531 F.3d 474, 478–79 (7th Cir. 2008) (concluding actions taken by the employer to try to accommodate the employee's work restrictions were not adverse)").

The acts of moving Schiele to light duty and reassigning him to Station 2 were not materially adverse. Rather, like the Department in *Koty*, the actions were within the right of the City to ensure its staffing and operations needs were met, as well as to ensure Schiele was accommodated.

First, the City's assignment of Schiele to light duty was to accommodate Schiele's intermittent FMLA leave and was not a reduction in pay rate, less prestigious, or particularly

harmful. [Facts, ¶¶ 36-7.] As Knight stated regarding the light duty, "[e]verything stays the same. The pay stays the same. The rank stays the same. The seniority continues to grow. Nothing changes." [Facts, ¶ 37.]

Second, like the sheriff's department in *Koty*, the City transferring Schiele to Station 2, a slower station, was a lateral move which is not considered an adverse employment action. *See also Washington v. Ill. Dept. of Revenue*, 420 F.3d 658, 661 (7th Cir. 2005). By transferring Schiele to Station 2 from Station 16, it allowed EFD to place a lieutenant at Station 16 that could consistently be physically present and actually perform the essential functions of the position.

Finally, Schiele never actually worked at Station 2. Rather, he performed his light duty at the EFD's administrative building, so Schiele's station assignment had no impact on his day-to-day work. His transfer to Station 2 was reflected on nothing more than paperwork, and he has no injury from being transferred there.

The City anticipates that Schiele will argue that Station 2 was the "punishment station" and that his transfer was punishment for taking FMLA leave. The City acknowledges that some individuals within the EFD referred to Station 2 in this manner, because it was a slower station, and many firefighters wanted to be where the action was. [Dkt No. 32-4 at 9 (Knight Dep. 48:12-15); Dkt No. 32-5 at 22 (Connelly Dep. 36:13-21); Dkt No. 32-6 at 15-6 (Anslinger Dep. 31:19-2, 32:1-16).] Others believed that firefighters went there after they were disciplined, but this does not account for the fact that highly decorated firefighters have been stationed there and that firefighters who had been disciplined served at other stations. [Dkt No. 32-4 at 10 (Knight Dep. 49:1-5).] In any event, the fact remains that no firefighter was ever sent to Station 2 as a form of discipline. [Dkt No. 32-5 (Connelly Dep. 36:13-17).]

Schiele cannot demonstrate that his assignment to light duty or his transfer to Station 2 was pretextual, because they were not, so his retaliation claim on these theories fails.

### b. Refusing an Exit Interview is Not an Adverse Action.

Schiele also claims that the refusal of an exit interview was an adverse action and was retaliatory; however, the City refusing an exit interview is not an adverse action. As courts have held, "[f]ederal law protects an employee only from retaliation that produces an injury." *Poullard v. McDonald*, 829 F.3d 844, 865 (7th Cir. 2016) (quoting *Stephens*, 569 F.3d at 790.) Further, as stated above, an adverse action is one that would persuade a reasonable worker from engaging in their protected activity or making or supporting a charge of discrimination. Refusing an exit interview, neither injured Schiele nor would have caused a reasonable worker to be dissuaded from utilizing their rights.

Schiele was informed by the City that he was not entitled to an exit interview as he did not resign and was not retiring as contemplated by the EFD's policy. Rather, Schiele was on disability pension. [Facts, ¶¶ 78-9.] Thus, the City was acting within its policies when it decided not to extend Schiele an exit interview. Further, while Schiele "wanted to ensure that the process was being followed by the EFD," the act of refusing him an exit interview did not cause him an injury, even if he was owed an exit interview as he believed. [Facts, ¶¶ 80-83.] Exit interviews typically benefit the employer rather than the employee; thus, Schiele cannot show that the City's decision was an adverse action. 14 Emp. Coord. Personnel Manual § 21:93 (2025).

### 2. The City Had Legitimate, Non-Discriminatory Reasons for Temporarily Withholding Wages and Requiring the Disability Hearing.

In the 7th Circuit, a retaliation claim requires proof of discriminatory intent, meaning evidence that the employer acted with a prohibited animus. *Juday v. FCA US LLC*, 57 F.4th 591, 596 (7th Cir. 2023) (citing *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 634 (7th Cir. 2009)). An

employee may establish the alleged discriminatory intent via direct or indirect proof. *Id.* Under the direct method, a plaintiff must present evidence that her employer took materially adverse action against him on account of the protected activity. *Vander Plaats v. Crisis Prevention Institute, Inc.*, 2024 WL 3897029, No. 22-CV-1122, *10 (E.D. Wis. 2024) (citing *Burnett v. LFW Inc.*, 472 F.3d 471, 481 (7th Cir. 2006)); *Wier v. United Airlines, Inc.*, 2024 WL 1328792, No. 1:19-CV-07000, *8 (N.D. Ind. 2024) (citing *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764 (7th Cir. 2016) (courts consider "whether the evidence, examined as a whole, would permit a reasonable factfinder to conclude that the plaintiff's protected activity caused the discharge or adverse action."). Under the indirect method, plaintiffs must show they were treated differently than a similarly-situated employee. *Juday*, 57 F.4th at 596, n.1. The Court should enter summary judgment in the City's favor on these two issues because Schiele cannot show discriminatory intent nor a similarly-situated individual.

### a. Pension Board Meeting.

Schiele alleges that the City's requirement that he attend the Fire Department's Pension Board for a determination on his disability was retaliatory; however, like his other claims for retaliation this one also fails. The City required Schiele to attend the Pension Board meeting not because he had been taking FMLA, but based on the available information, Schiele's disability continued to worsen and progressed to the point that he was unable to perform the essential functions of his job. [Facts, ¶¶ 12-16, 23-27, 40-49, 52-55, 69.] The City's decision was supported by Schiele's medical evaluations with Dr. Hines, the evaluation notes from Dr. Ahmed, Dr. Ahmed's accommodation letter, and Schiele's own statements.

Dr. Hines' reports showed the City that Schiele was increasingly getting worse. During the meeting with Schiele on February 18, 2022, Schiele rated his usual daily depression level at

2-3/10 and his anxiety as 4-5/10. [Facts, ¶ 16.] However, by Schiele's last meeting with Dr. Hines on October 21, 2022, Schiele stated that his anxiety level was very high and rated it as 11 out of 10 and "unreal," and he declined to rate his level of depression. [Facts, ¶ 46.] These ratings, along with Dr. Hines' notes that she did not feel comfortable clearing Schiele to return to the fire station because his medications, along with his depression and anxiety, typically cause slowness of thought which affects decision-making, highlighted to the City that Schiele was not improving and was unlikely to be able to continue in his role as a firefighter. [Facts, ¶ 47.]

In addition to Dr. Hines' medical opinion, the City also relied on the evaluation notes and accommodations letter from Dr. Ahmed, as well as Schiele's own statements. The accommodations letter requested various accommodations from EFD for Schiele, most notably it requested that Schiele be placed in a dimly lit room away from the radio, given notice of tasks a day ahead and the option to work from home. [Facts, ¶ 55.] As an emergency response agency, these requested accommodations were fundamentally at odds with Schiele's position in the EFD, the essential functions of which included the need to perform "critical, time-sensitive complex problem solving" and "operating fire apparatus or other vehicles…with emergency lights and sirens." [Facts, ¶ 7.] It was based on these facts that the City made the determination to have Schiele attend the Pension Board meeting, a determination that was not made lightly but with concern for Schiele, Schiele's coworkers, and the citizens of Evansville.

In addition to the accommodations letter, Dr. Ahmed's evaluation notes stated that Dr. Ahmed felt that Schiele "is unable to work in the capacity in the fire department." [Facts, ¶ 71.] The Pension Board took note of these facts, along with Schiele's stipulation that he had a covered impairment, when it considered whether Schiele could continue as a firefighter or should be placed on disability. [Facts, ¶ 70.] At no point was the City's recommendation that the Pension

Board be held, nor the recommendations of the Pension Board, in retaliation for his usage of FMLA/ADA. Schiele cannot point to any evidence to show otherwise; further, Schiele is unable to point to any other similarly-situated employees of the fire department that were treated differently.

If any doubt remained that the City's decision to bring Schiele before the Pension Board was a legitimate employment action, it was eliminated by Schiele's words and actions thereafter. First, Schiele stipulated at the hearing that he had a covered impairment. Certainly, the City could not have been wrong to bring him before the Pension Board for a disability hearing, when Schiele himself conceded that he was disabled. Second, Schiele appealed the Pension Board's determination, but not the specific determination that he covered impairment. Rather, Schiele filed an appeal claiming that he was entitled to *even more* benefits. As there is no evidence that shows that the City's decisions were made with a discriminatory intent, the Court should grant its motion for summary judgment on the issue.

### b.  Withholding of Wages.

The City disputes that the withholding of Schiele's wages was in retaliation of Schiele's filing of a Charge of Discrimination. Schiele's wages were withheld because he had failed to return all his department issued PPE as requested by the City. [Facts, ¶ 80.] Schiele stated that he would not return the PPE, which did not belong to him, until such time as he received an exit interview. [Facts, ¶ 82.] However, as stated above, Schiele was not owed an exit interview and the refusal to return PPE until he received one was an act of leverage on his part. Because Schiele had refused to return the PPE, which as stated did not belong to him, the City deducted the cost of the PPE until Schiele returned it. [Facts, ¶ 81.] The withholding of wages was directly caused by Schiele's refusal to return the PPE. Once Schiele returned the PPE, the wages were

returned to him. [Facts, ¶ 83.] Schiele presents no evidence that the withholding of wages was in retaliation for his filing of a Charge of Discrimination and even admits that he received the money upon returning the PPE.

Even putting aside all of the above, Schiele's withholding of wages retaliation theory suffers from a more fundamental flaw— there are no damages. *See Poullard v. McDonald*, 829 F.3d at 865 ("[f]ederal law protects an employee only from retaliation that produces an injury.") Schiele testified, and he reaffirmed in his Statement of Claims that the remedy he seeks for the withholding of wages is liquidated damages. [Dkt No. 32-10 at 5-6.] Stated another way, the only damages he seeks are those provided by an Indiana statute, and even then, he can only recover by proving that the withholding was in bad faith. *See* Ind. Code § 22-2-5-2. Because there are no *actual* damages, the City is entitled to summary judgment in its favor on Schiele's retaliation claim as to the withholding of wages.

**C.    The City is Entitled to Summary Judgment in its Favor on Schiele's State Law "Failure to Pay Wages" Claim.**

For the same reasons that Schiele's retaliation claim with respect to wages fails, so too does his state law claim under Ind. Code § 22-5-2-2. As has already been established, the only potentially recoverable damages, liquidated damages, require a showing that the City acted in bad faith. *Id.* The undisputed material facts show that $1,467 in wages were temporarily withheld, because Schiele refused to return all of the PPE— property belonging to the City of Evansville. [Facts, ¶¶ 80-83.] As the Indiana Court of Appeals recognized, liquidated damages are not appropriate when wages were withheld pursuant to a "bona fide dispute." *See Franciscan Alliance, Inc. v. Metzman*, 192 N.E.3d 957, 967 (Ind. Ct. App. 2022) (citing *DeGood Dimensional Concepts, Inc. v. Wilder,* 135 N.E.3d 625 (Ind. Ct. App. 2019)). As the temporary

withholding of wages was the result of a bona fide dispute, and Schiele has already been made whole, the City is entitled to summary judgment as to Count IV of the Complaint.

### D.     Schiele Cannot Demonstrate That City Improperly Disclosed His Confidential Medical Information.

The information that Schiele claims was improperly disclosed are the "conclusions" that he believes people drew from the Dr. Ahmed Accommodations Letter. [Facts, ¶ 58.] Schiele's claim fails for three primary reasons. First, this information is not protected by the ADA. Second, this information could not have been "disclosed," as anyone who saw Schiele working in a separate office with the lights off could have just as easily drawn the conclusion that he was receiving accommodations. Third, any communications regarding Schiele's request for accommodation was made only to people with a legitimate reason to be made aware of such accommodations.

"[I]nformation obtained from a required medical examination regarding an employee's medical condition must be kept confidential except that, among other things, 'supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations.'" *Foos v. Taghleef Industries, Inc.*, 132 F.Supp.3d 1034, 1050 (S.D. Ind. 2015) (quoting 42 U.S.C. § 12112(d)(4)(C)). To state a claim for violation of 42 U.S.C. § 12112(4)(C), "a plaintiff must allege that his employer obtained his medical information through employment-related medical examinations and inquiries, the information obtained through such means was disclosed by the employer rather than treated as confidential…, and he suffered a tangible injury as a result of the disclosure." *Shoun v. Best Formed Plastics, Inc.*, 28 F.Supp.3d 786, 788-89 (N.D. Ind. 2014) (citing *Franklin v. City of Slidell*, 936 F.Supp.2d 691, 711 (E.D.La.2013); *Flamberg v. Israel*, No. 13–62698–CIV, 2014 WL 1600313, at *4 (S.D.Fla. Apr. 21, 2014)).

26

**1.  The Information at Issue was not protected by the ADA.**

Schiele stated that the information at issue was the "conclusions" people could draw from the accommodations letter provided to the City by his psychiatrist, Dr. Ahmed. [Facts, ¶ 58.] As stated by Schiele in his deposition:

```
21    Q     Again, I just want to be clear because we kind of
22          went back and forth on it. The information at
23          issue is the accommodations letter -- well, you
24          said conclusions that people may draw from the
25          letter. Is there anything else?
1     A      Conclusions that people did draw from the letter.
2           And then I can't think of anything else now, no.
```

[Facts, ¶ 58.]

Thus, even if information regarding his accommodations was disclosed it was not protected by the ADA. Courts, when considering if confidential medical information was improperly disclosed in violation of the ADA, must determine if it is information that was obtained "through employment-related medical examinations and inquiries." *Foos*, 132 F.Supp.3d at 1050. Courts have established that when an employee makes a voluntary disclosure of information in relation to a request for accommodation, the employer isn't legally obligated to maintain its confidentiality. *Shoun*, 28 F.Supp.3d at 789 (citing *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1048 (10th Cir. 2011) (confidentiality provisions of ADA not violated because employee had "voluntarily disclosed to [employer's human resources manager] that he was HIV-positive"); *Cash v. Smith*, 231 F.3d 1301, 1307 (11th Cir.2000) ("[T]he disclosure that Cash complains of was not of the result of an examination ordered by [his employer], but of a voluntary disclosure that Cash made to Smith[, his supervisor].")

There is no dispute that Schiele's psychiatrist, Dr. Ahmed, voluntarily sent the City the letter on Schiele's behalf requesting that Schiele be given certain accommodations. [Facts, ¶¶ 52-

4.] As the accommodation letter was voluntarily disclosed to the City, it cannot be the basis for a claim under 42 U.S.C. § 12112.

### 2. Information that is out in the open cannot be "disclosed."

Further, other individuals could have as easily drawn conclusions regarding Schiele's accommodations because he was working light duty rather than working at a station. Moreover, Schiele specifically requested that he be placed in a dark room, away from the radio, and that he be given 24-hour advanced notice of job tasks. Anyone who saw Schiele sitting in a dimly lit room and away from the radio could just as easily make the conclusion that Schiele was receiving accommodations, because these are not normal working conditions for a firefighter, even one placed on light duty. In other words, the very nature of Schiele's requested accommodations made it readily observable to anyone visiting the administration building that he was receiving accommodations. Accordingly, Schiele's accommodations could not be "disclosed," because they were never a secret.

### 3. Schiele's Request for Accommodations Was Not Improperly Disclosed.

As stated in 42 U.S.C. § 12112(d)(3)(B)(i), "supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations." The purpose of this provision is to ensure that information "spreads no farther than necessary to satisfy the legitimate needs of both employer and employee." *Porfiri v. Eraso*, 121 F. Supp. 3d 188, 199 (D.D.C. 2015) (quoting *Doe v. U.S. Postal Serv.*, 317 F.3d 339, 344 (D.C. Cir. 2003)). Schiele claims that Anslinger, Campbell, Larson, Cohen, Kane, and Zuber were all told the information in his accommodation request directly and had no reason to know. Schiele could not explain why these individuals had no reason to know, and when pressed, admitted that he just was not sure whether they needed to know or not. [Dkt No. 32-3 at 43-4

(Schiele Dep. 65:24-25, 66:1-2, 20-24).] However, as stated by Chief Connelly, the above-described individuals needed to be informed about Schiele's request for accommodations because of staffing and operations reasons. [Facts, ¶¶ 59-66.]

For instance, Anslinger was informed as he was the second in command of the EFD and would be in charge if Chief Connelly wasn't available; further, Anslinger was on the EFD executive staff. [Facts, ¶ 59-61.] If Kane was informed, it was because he was a district chief in charge of the station Schiele was assigned to. [Facts, ¶ 65.] Larson was informed as Schiele's day-to-day supervisor, and because he was the admin chief in charge of staffing and scheduling of personnel; further, Larson was on the EFD executive staff. [Facts, ¶ 59-60, 63.] Cohen was informed as Schiele's Captain. [Facts, ¶ 64.] Campbell was informed as he was in charge of operations for the EFD and was on the EFD executive staff. [Facts, ¶ 59-60, 62.] All were informed for both the legitimate needs of the City and ensuring that Schiele was accommodated as necessary for his disability. In addition, Chief Connelly discussed Schiele's accommodations with Zuber as he was Schiele's union representative, and the elected representative of the firefighters. [Facts, ¶ 66.]

Schiele's belief that his confidential medical information was improperly disclosed is based on nothing more than secondhand information from two of his colleagues from Station 16, Scott Olsen and Eric Baumberger. [Dkt No. 32-3 at 45 (Schiele Dep. 67:3-6, 16-18).] To be sure, Schiele has not seen any documents showing that his medical information being sent somewhere he didn't believe it should be. [Facts, ¶ 67.] Schiele's belief that his medical information had been disclosed because others had mentioned his use of FMLA or had known of his accommodations is merely speculation. *Stagman v. Ryan,* 176 F.3d 986, 995 (7th Cir. 1999)

(statements made outside the witness's personal knowledge or statements that are the result of speculation or conjecture cannot create a genuine issue of material fact.)

This use of speculation to try and prop up a claim of improper disclosure of confidential medical information is similar to the use by the plaintiff in *Smithson*. In that case, the district court found that the plaintiff was required to show that "the medical information was disclosed by the employer." *Smithson v. Miller*, 2022 WL 4098583, No. 1:20-cv-03021-JRS-MJD, *6 (S.D. Ind. 2022) (citing *Brown v. Wilkie*, No. 1:20-cv-01154-JPH-MJD, 2022 WL 1658802, at *10 (S.D. Ind. May 24, 2022).

In attempting to meet this burden of proof, the *Smithson* plaintiff alleged that "her information must have been disclosed because people who had no other way of knowing about her medical condition knew about it, as evidenced by the constant efforts to disrupt Smithson's work environment and affect her anxiety and attention deficit." *Id.* The district court held, like it should here, that this allegation was "merely speculation, which will not defeat summary judgment." *Id*. (citing *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (quoting *Tubergen v. St. Vincent Hosp. & Health Care Ctr.*, 517 F.3d 470, 473 (7th Cir. 2008) ("inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion"))). As there has been no proof established that the City improperly disclosed Schiele's information, the Court should grant summary judgment in Defendant's favor as to Count I of the Complaint.

## V.    CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant its Motion for Summary Judgment and award it all other relief that is just and proper in the premises.

Respectfully submitted,


ZIEMER STAYMAN WEITZEL SHOULDERS, LLP

*/s/ Matthew S. Koressel*
James P. Casey, #3792-82
Matthew S. Koressel, #35276-49
Ziemer, Stayman, Weitzel & Shoulders, LLP
20 NW First Street, 9th Floor
P.O. Box 916
Evansville, IN 47706-0916
Tel: (812) 424-7575
Fax: (812) 421-5089
E-Mails: jcasey@zsws.com and mkoressel@zsws.com
*Attorneys for Defendant*




## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of March, 2025, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all registered parties by operation of the Court's electronic filing system.

Kyle F. Biesecker and Lauren E. Berger
BIESECKER DUTKANYCH & MACER, LLC
kfb@bdlegal.com
lberger@bdlegal.com

*Matthew S. Koressel*
Matthew S. Koressel

31